## N. Y. SUPERIOR COURT.

DAVID WOOLF, appellant, agt. AARON JACOBS and JULIUS G.
SALHINGER, respondents.

It is the duty of the general term, on an appeal from an order made at
special term, to examine anew the facts and law on which the order was
granted.

Where a judgment was entered in June, 1869, and the defendant, in his
affidavit, stated that in March, 1870, he first became possessed of the facts
on which he moved for a new trial on the ground of newly discovered
evidence, and on the further ground of falsehood, fraud and perjury,
but delayed his motion until the month of August following, the defend-
ant in such case is guilty of *laches*, and his motion for a new trial should,
on that ground, have been denied.

Where eight witnesses in their affidavits testified to declarations and
admissions made by the plaintiff to them, which, if true, showed that
the judgment which the plaintiff recovered against the defendants had
been obtained by fraud and perjury, it was *held* that such alleged decla-
rations and admissions afforded no ground to set aside the judgment and
to grant a new trial, especially when it appeared, as it did in this case,
that the parties making the affidavits had perjured themselves.

Reflections of the court upon the moral turpitude this case presents, and
the hope indulged that it is an isolated one.

*General Term, July,* 1872.

APPEAL from an order granting a new trial.

On the 11th day of June, 1867, the plaintiff recovered a
judgment against the defendant for $10,784.44, founded upon
the report of a referee after a lengthy and contested trial
upon the merits.

On the 17th August, 1870, the defendant, Aaron Jacobs,
moved for a new trial on the ground of newly discovered
evidence, and on the further ground of falsehood, fraud and
perjury. His affidavit was accompanied by affidavits made

by Moses Nelson, Gustave Nelson, Joshua Singer, Jacob Ladner, Frank Copper, Abraham Levy, Solomon Bernstein and Fannie Nelson, all testifying, in detail, to certain admissions which the plaintiff had made to them to the effect that the judgment he recovered against the defendants was obtained by fraud and perjury. The plaintiff presented counter affidavits.

The motion was heard before chief justice BARBOUR, who granted a new trial, the judgment to stand as security and the defendants to execute a bond to pay all future costs attending such new trial in a sum not exceeding $500. The plaintiff appealed to the general term of this court, and the additional facts will be found in the opinion of the court.

C. BAINBRIDGE SMITH, *of counsel for the plaintiff and appellant.*

DU BOIS SMITH, *attorney.*

*First.* The affidavits, on the part of the defendants, are absurd, improbable upon their face, and bear the impress of a bold conspiracy to cheat and defraud the plaintiff. A gross deception was successfully practiced upon the court below, and in its design and accomplishment it displays a skill and cunning beyond the plane of laymen.

*Second.* If the alleged statements set forth in the moving affidavits were true, the defendants were not entitled to a new trial. Many judgments would be set aside if it only required affidavits to prove alleged admissions of the party in whose favor a judgment had been recovered.

*Third.* Proof of the admissions and declarations of parties is the most unsatisfactory species of evidence, and is always scrutinized and received with caution as the most dangerous evidence that can be admitted in a court of justice (*Malin* agt. *Malin*, 1 *Wend.*, 625 ; *Law* agt. *Merrills*, 6 *id.*, 268).

*Fourth.* The alleged newly discovered evidence is cumulative. Cumulative evidence is additional evidence of the same kind.

If the newly discovered evidence relates to any fact proved or contradicted, whether bearing upon issues directly or collaterally, it is cumulative (*Fleming* agt. *Hallenbach*, 7 *Barb.*, 271, 278; *Leavy* agt. *Roberts*, 2 *Hill*, 285, 287, 288; *Brisbane* agt. *Adams*, 1 *Sandf.*, 198; *Peck* agt. *Hiler*, 30 *Barb.*, 655, 662).

*Fifth.* Newly discovered evidence which goes merely to impeach the credit of a former witness examined on the trial is not ground for the granting of a new trial, but in all cases it must relate to some *new fact* upon which evidence was not given on the trial already had, and must be so important in its nature as to induce a belief that if proved to the satisfaction of a jury it would control their verdict (*Harrington* agt. *Bigelow*, 2 *Den.*, 109; *Williams* agt. *Baldwin*, 18 *J. R.*, 489; *Hallingworth* agt. *Napier*, 2 *Cai.*, 182; *Quinn* agt. *Lloyd*, 1 *Sweeney*, 253).

*Sixth.* The defendants have been guilty of *laches*, and no excuse is shown for the delay which their own affidavits set forth. In all motions of this nature it must appear that the evidence could not have been with reasonable diligence obtained before the trial (*Id.*; *Leavy* agt. *Roberts*, 2 *Hill*, 285; *People* agt. *Marks*, 2 *Park.*, 261; *S. C.*, 10 *How. P. R.*, 261).

*Seventh.* A motion for a new trial on the ground of newly discovered evidence will not be heard without a case. No case was made in this action, and the reason why it was not served is because it would show that similar admissions were alleged to have been made by the plaintiff by other witnesses, and that the referee discredited their testimony. But the omission to serve a case is and ought to have been fatal to the defendants' motion (1 *Burrill's Prac.*, 467; *Anon.*, 7 *Wend.*, 331; *Rapelyea* agt. *Prince*, 4 *Hill*, 125; *Rule* 41 *of this and supreme court*).

CHRISTOPHER FINE, *attorney and counsel, for the defendant.*

*First.* The order is not appealable. The application was for a new trial on the ground that the judgment had been obtained by the plaintiff by means of falsehood, fraud and perjury. It is not appealable to the court of appeals (*Baldwin agt. The Mayor, &c.*, 2 *Keyes*, 287; *Lawrence agt. Ely*, 38 *N. Y.*, 42; *The East R. Bank agt. Kennedy*, 4 *Keyes*, 279; *Lansing agt. Russell*, 2 *Comst.*, 563).

*Second.* The case presented by the affidavits on the part of the defendants, nine in number, make it pre-eminently just that a new trial should be granted to the defendants. It is not impeaching evidence nor is it cumulative (*Oakley agt. Sears*, 1 *Abb. Pr.* [*N. S.*], 368; *De Witt agt. Klinck*, 43 *Barb.*, 203).

*Third.* Motions for new trials are addressed to the discretion of the court, whether based upon the weight of evidence, surprise or newly discovered evidence, and are liberally granted in furtherance of justice (*Platt agt. Munroe*, 34 *Barb.*, 291; *Hoppock agt. Stone*, 49 *id.*, 524; *Tyler agt. Hornbeck*, 48 *id.*, 197).

*Fourth.* New trials have frequently been granted where there has been reason to suspect that perjury has been committed (*Morrell agt. Kimball*, 1 *Greenl.*, 322). In *Thurtell agt. Baumont* (3 *Burr.*, 1171) the court granted a new trial on the ground claimed by the defendant and indicated by his affidavits used on a motion, that the whole story of the plaintiff was a scheme of villany, supported by perjury, and the plaintiff never dared to try the cause again. Such, we claim, is the case at bar (*See Thurtell agt. Baumont*, 1 *Bing.*, 339).

*Fifth.* The order granting a new trial should be affirmed, because the ends of justice will be subserved thereby, and the plaintiff cannot sustain any prejudice, even in the judgment which he holds by the tenure and reward of his perjury.

*By the Court*, SEDGWICK, *J.*—It is the duty of the general term to examine anew the questions of fact and law that arose upon the motion for a new trial, and which were granted, sub-

ject to certain conditions at the special term (*Macy* agt. *Wheeler*, 30 *N. Y. R.*, 231).

Judgment in this action was entered June 11, 1869. A new trial was asked on the ground of newly discovered evidence, and on the further ground of falsehood, fraud and perjury. The motion was made on an order to show cause, granted August 17, 1870, upon affidavits sworn to on and about August 15, 1870. Proceedings supplementary to execution for the examination of the defendants were begun 30th May, 1870. These fell through, and others were instituted in July, 1870, on which adjournments were had until the middle of the next August, when this motion was made.

The affidavit of the defendant, Aaron Jacobs, states that he had no information of the facts upon which the motion was based until 13th March, 1870. He delayed making the motion until August. This delay is not excused, and, when considered in connection with the facts that will hereafter be examined, and that in the intervening time supplementary proceedings were begun against him, was itself cause for a denial of the motion.

In main, the facts on which a new trial was asked are stated in the affidavit of Moses Nelson. In the present action, an attachment had been levied upon individual property of each of the defendants.

The amount of Jacob's property levied upon was about $800 in value, and of Salhinger's was about $6,000. Nelson became a surety on an undertaking for the release of Salhinger's property from the attachment. The present plaintiff assigned to Mr. Berry the judgment and the cause of action on the undertaking. The judgment being entered June 11, 1869, then an action in the month of July, 1869, was begun by Berry against Moses Nelson on the undertaking. In such action an attachment was issued against Nelson. It will not be necessary and it would take too much time to point to all the inferences to be drawn in this case. Most of them are suggested by a bare statement of the facts. Nelson's affida-

vit avers that in April, 1868, defendant, Salhinger, asked him to become security on the undertaking to release Salhinger's goods. from attachment in this action. At first Nelson declined, but was called upon by the plaintiff, Woolf, and he asked Nelson to sign the undertaking. Salhinger was the brother-in-law to Woolf. Nelson asked Woolf what the suit and attachment meant. Woolf said that Nelson need not be alarmed, and would run no risk in signing; that the attachment was procured only to force Jacobs to release a judgment which the present defendants had obtained against Woolf, which had been assigned to Jacobs, and on which Jacobs had issued an execution against Woolf's real estate in Sullivan county; that he, Woolf, to protect himself, had brought this action. Woolf then further stated, according to Nelson's affidavit, with great minuteness, for instance, the minuteness a lawyer would use in pleading in its length and breadth and consequences a tort committed by a defendant, the fraud he, Woolf, had begun and intended to accomplish in this action.

The substance was, that Woolf had no cause of action against the defendants. The affidavit alleges that Woolf, among other things, said that he, " the said Woolf, was going to charge that the boxes or trunks, which he had sent to them with articles for his own use and accommodation, contained merchandise for them, the said defendants, and that they agreed to sell such merchandise for him; but that, in fact, he never had shipped or sent to said defendants any goods or merchandise, and that they had never received any goods or merchandise from him, or promised to sell any for him; but that he had commenced a suit for such made-up claim, and had sworn out an attachment against the defendants under the mere pretense that they were about to dispose of their property to defraud creditors; and that, under such attachment, he had taken the goods of the defendant for goods which he claimed belonged to the defendants;" that he knew this would force an immediate settlement with Jacobs, that this action would never be tried, and that

Nelson could safely sign the undertaking for Salhinger, and he would never hear anything more about the action.

The property owned by Jacobs, that had been attached, was about in value $800, of Salhinger's, $6,000. This is stated again to bring it in connection with Woolf's alleged conversation.

But it is impossible, within the limits made for this decision, to disentangle such a garbled mass of conflict.

Nelson, although he had thus been clearly, explicitly and deliberately put in possession of this scheme of fraud and perjury, seems, by the general effect of his affidavit, not to have appreciated it; and he directly says, in an earlier part of his affidavit, that he had become security on the undertaking.

" On an attachment, sworn out as deponent verily believes falsely, sworn out by the said plaintiff against the said defendants, on the, as the deponent now verily believes, false and fraudulent charge that the said defendants were about to dispose of their property to defraud creditors."

The affidavit goes on to state that, on having this talk, Woolf asked Nelson to go with him to his lawyer, " saying that deponent would then learn the facts to be as he, said Woolf, stated them to deponent."

That is, in substance, that if he (Nelson) would not believe from Woolf's own statement what a rascal he was, his counsel would tell him facts that would convince him. By the affidavit the lawyer had not the slightest hesitation in demonstrating Woolf's rascality, and in admitting his equal depravity; and that, too, in the presence of another witness (Gustave Nelson), who had been taken there by Moses Nelson. Gustave Nelson is not stated to have been called there in the interest of anybody, or for any special purpose. Woolf and his counsel had no fear of him; for "the said Woolf repeated to this deponent, in the presence of his said attorney, Mr. Smith, everything that is above stated, and that the said Mr. Smith affirmed the truth thereof; but said

that his expenses and the sheriff's expenses, amounting to $500 on the said attachment against the said defendants, on which the Salhinger's goods had been taken, must be paid before the goods could be released, and that if that money was paid to him the goods would be released," and the action would never be carried any further; that Nelson could safely sign the undertaking and would run no risk; that the said Woolf only wanted to use the action that time for the purpose of compelling the defendant Aaron Jacobs to release Woolf from the judgment of $4,875.

It is also presented by the affidavit for our belief that all this was said in the further hearing and presence of Mrs. Woolf, the wife of the plaintiff and sister of Salhinger; and, further, that she, before the lawyer and the two Nelsons, "upbraided her husband for bringing said action, and for falsely swearing out said attachment." She never, however, seems to have tried to stop the wrong she reproached her husband with, by conveying information of it, and the means of proving it to her brother.

This seems to have led Moses Nelson to suspect that there was something wrong and he believed what they said, for he swears that he, "believing the statements of said plaintiff and his said wife and attorney, signed the said undertaking." "And this deponent also, then and there and at the request of the said plaintiff and on his promise to refund the same, pay to his said plaintiff's said attorney, Mr. Smith, the sum of $500, and was then again informed that that would be the last he, this deponent, would ever hear of said action."

The plaintiff must have had remarkable influence over Moses Nelson. He had refused to sign the undertaking at Salhinger's own request, yet he yielded to the force of the considerations presented by Nelson, that he, Woolf, had brought the action in fraud and sustained it by perjury, and as it could come to nothing, he, Nelson, had but become liable in the sum of $5,000, and besides lent him, Woolf, in cash. $500.

Woolf agt. Jacobs.

At the end of the affidavit one sentence is added as a subject which indeed calls for explanation, and this sentence discredits all the rest.

It is, that the deponent never informed the defendants hereof until within the last few months, that is, from April, 1868, to March, 1870. Not only was he not moved by good nature or something better to at once take very little trouble to seek out Jacobs or Salhinger, or to send either a message to let them know how things stood, but he did not do so much even to protect himself against his contingent liability on the undertaking.

Woolf's statements did not create any surprise in him, for he did not, it seems, remonstrate with Woolf or express any sympathy with Mrs. Woolf's sound feeling on the subject. Perhaps it is more remarkable that he never tried to get his $500 back from any one.

But the affidavit states that, supposing the action had been abandoned, he gave the same no attention until after judgment was entered, and when, in the next month of July, 1869, an action was brought against himself on the undertaking by Mr. Berry.

His answer in that action will be hereafter referred to. Even this did not put him to communicate his knowledge to Jacobs or Salhinger.

After this time he says he several times reminded Woolf of what he had told him about having no claim, &c., on which occasions Woolf said he was sorry he ever commenced the action, but he was compelled to go on by his attorney and to swear to the claim, *and have his children do so.*

Besides, at various times after the arguing of the undertaking, Woolf had asked Nelson to intercede with Jacobs to have him release Woolf from the judgment against him, "but that this deponent, not being intimate or on friendly terms with said Jacobs, refused to have anything to say to him." And he says he never did see Jacobs even after the action was brought against himself, although clearly it was a

matter of great interest to him that Jacobs or Salhinger should know what would suffice to prevent judgment being had against them, or to set it aside, if obtained.

Nelson further swears that Woolf made the original statements to him at his place of business in Delancey street, in the presence of Gustave Nelson, Joshua Singer and Frank Coffer. Woolf did not hesitate to admit and describe, with great clearness, his villany before these three.

As might have been anticipated, Nelson's answer in Berry against himself is the antipodes of his affidavit. In that answer, first, he said that Woolf was the real party in interest. He then "admits that, at the solicitation of the said Julius G. Salhinger," "he did, under the circumstances hereinafter stated," execute the undertaking.

These circumstances, as afterwards stated, do not include and they are not consistent with those stated in his affidavit.

The answer proceeds to allege that he was induced to sign the undertaking by Woolf's representations to him, " that the same was obligatory only on him, the said defendant, and for the due appearance of the said Aaron Jacobs and Julius G. Salhinger in the said action," and that, confiding in such representations, he executed the undertaking.

The answer immediately goes on to say that the action ought not to be maintained, because that the said Julius G. Salhinger, colluding with Woolf and Woolf's agent, *did* pay to Woolf's agent " the sum of $500 to procure him to accept, pass and receive the said undertaking; and thereupon the agent of the said plaintiff's assignor (Woolf), to secure the payment of the said sum of $500 to be paid to him by said Salhinger, did, with the knowledge and assent of the said plaintiff's assignor, induce this defendant to execute the said alleged undertaking knowingly, and represented to him, the said defendant," that he would become liable on the undertaking only for the personal appearance of Jacobs and Salhinger, and these representations induced him to sign the undertaking, " and, therefore, the said Salhinger paid to the

Woolf agt. Jacobs.

agent of the said plaintiff's assignor the said sum of $500."

One of the concluding averments is, that Woolf had received from Jacobs and Salhinger $1,100 on account of the undertaking. This furnishes another occasion to point to the incredible assertion of Nelson, that, the circumstances contained in the affidavit being true, he never sought Jacobs or Salhinger, even in his own interest, until a few months before August 15, 1870.

A statement of the contents of this answer is sufficient; it would be a waste of time to comment on them. The disagreeable details of the case would not have had the attention that has been given to them if the court below had not taken a view from a different position; and it is proper to justify, at length, the reversal of the order appealed from. The unusually rigorous conditions imposed upon granting the order, probably indicates the view of the merits of the case held by the learned judge who made it. Enough has been said to show that the motion for a new trial should have been denied.

It is not important to look, except generally, at the further affidavits presented in support of the motion. Three of these affidavits are by persons in whose presence and hearing Woolf was alleged by Nelson to have unfolded, with much detail, his actual and intended fraud and perjury.

Another of the affidavits alleged that Woolf tried to subom the deponent to swear falsely in this action, Woolf at the same time stating with great exactness the nature of the fraud in the same terms as are set forth in the other affidavits. Another affidavit, signed by one who makes his mark, states that he was called upon by Woolf, who, as to all the other persons making affidavits, described to him with much care what the fraud was and why and how he undertook it, and then requested him to become his surety on the undertaking to procure the attachment. He declined so to become, and then Woolf consulted him as to whether he thought Mr. Bernstein would if he paid him for his trouble. Woolf went

out and brought Mr. Solomon Bernstein to the deponent's store and stated to him all that he had stated to deponent. Mr. Bernstein said he disapproved of any of such proceedings and would not become security. Mr. Solomon Bernstein, who gives no residence in his affidavit, says in it that he has read the foregoing affidavit and that its statements are true. Lastly, as if to make assurance doubly sure, Mrs. Fannie Nelson, wife of Moses Nelson, swears that she was at her husband's store in Delancey street at the interview between Woolf and her husband, at which, by the other affidavits, it is said that Gustave Nelson, Joshua Singer and Frank Coffer were present, and she says she heard Woolf say all her husband swears he heard him say. Mrs. Nelson had not been named by any one else as being present on that occasion.

Mrs. Nelson was the eighth witness, who, in April, 1868, knew from Woolf himself, circumstantially, the fraud he meant to commit against Salhinger, his brother-in-law, and Jacobs; yet, from that time until March, 1870, at the earliest, no one of these witnesses had conscience enough or kindness enough to, in some way, let the deponents learn the facts, nor what would be as improbable had chance taken some rumors of the facts to the defendants, unless the eight stopped their mouths tighter than did ever any other eight persons in possession of a secret and a scandal, and without a duty to keep still, but with a duty to speak out, in the course of these two years hundreds would have known all about it, and the eight would not have reappeared for the first time and altogether, just when supplementary proceedings had reached an actual point.

These affidavits have the effect of increasing the original improbability of Nelson's statement, until it gets the strength of a moral demonstration that the testimony is untrue.

It would be a waste of time to look at the opposing affidavits and papers to see what additional reasons they give for discrediting the affidavits in support of the motion.

It is to be hoped that this is an isolated case of the kind.

It cannot be believed that there are numbers or groups of men in our society who are willing to face the day, in a court, and by agreement to give on their oaths false testimony that has not, to support it, even plausibility.

· But it does not need to be repeated to remind courts that the law should be sternly enforced against such combinations, whether they are for plaintiffs or for defendants.

There were technical grounds urged on the argument, both for and against the reversal of the order below.    This is a case which should be decided on the merits.

The order appealed from should be reversed with costs.

McCunn and Freedman, JJ., concur.